IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTY L. HOLTCAMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-00750-CV-W-NKL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Pending before the Court is Plaintiff Christy L. Holtcamp's ("Holtcamp") Motion

for Summary Judgment [Doc. # 9]. Holtcamp seeks judicial review of the

Commissioner's denial of her requests for disability insurance benefits under Title II of

the Act, 42 U.S.C. §§ 401, et seq., and supplemental security income (SSI) benefits based

on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The complete facts

and arguments are presented in the parties' briefs and will be duplicated here only to the

extent necessary.[1] Because the Court finds that the Administrative Law Judge's decision

is supported by substantial evidence in the record as a whole, the Court denies

Holtcamp's motion.

I.      **Factual Background**

_____

[1]  Portions of the parties' briefs are adopted without quotation designated.

1

A.     **Medical Records**

Holtcamp's claim for disability is based on her complaints of persistent and
pervasive pain.  Although Holtcamp suffered injuries in a near-fatal motorcycle accident
in 1978 or 1979, she believed she had recovered from that accident.  According to
Holtcamp, her current pain began during her work at a manufacturing plant in 2000.  (Tr.
319).[2]  Holtcamp began seeking treatment for back pain and rheumatoid arthritis at St.
Luke's Medical-Warrensburg, Missouri, on April 10, 2003.  Several physicians affiliated
with St. Luke's treated Holtcamp throughout the alleged disability period.

Kimberly McKeon, M.D. ("McKeon"), initially noted tenderness in Holtcamp's
lower lumbar and right paraspinous muscles.  (Tr. 133).  Holtcamp exhibited a normal
gait.  (Tr. 133).  McKeon assessed low back pain and suspected disc herniation.  (Tr.
133).  She prescribed Holtcamp Prednisone and Vicodin.  (Tr. 133).  An MRI of
Holtcamp's lumbar spine revealed paracentral posterior disc protrusion at L5-S1
impinging upon the S1 root and degenerative annular bulging with radial posterior
annular fissure/tear at L4-5. (Tr. 130).

In January 2003, Holtcamp underwent an evaluation by David Glover, M.D.
("Glover"), who is also affiliated with St. Luke's.  Glover diagnosed Holtcamp with
generalized muscle pain, possible fibromyalgia, generalized anxiety disorder, and irritable

---

[2]  The record is inconsistent as to both the date of the motorcycle accident and whether it was an
onset point for Holtcamp's pain.  During her hearing, Holtcamp stated that she had recovered
from the 1978 accident.  (Tr. 319).  One of her physicians, Harold Hess, M.D., noted that
Holtcamp had suffered pain in her neck, back, chest wall and mid-chest wall "ever since" her
1979 accident.  (Tr. 267).

2

bowel syndrome ("IBS"). (Tr. 129). He prescribed Holtcamp Topamax. (Tr. 129). Glover treated Holtcamp again in December 2003 and January 2004. (Tr. 127, 126). She complained of a painful mass in the left side of her neck, right shoulder aching, anxiety and some depression, but she denied headaches. (Tr. 127, 126). Holtcamp had a full range of pain free motion in her neck without weakness. (Tr. 126, 127). She also exhibited excellent rotator cuff strength, good grip strength, and normal elbow strength. (Tr. 126). She exhibited no extremity swelling. (Tr. 127). Holtcamp did not stay on the prescribed Topamax so Glover switched her to Neurontin. (Tr. 126).

On May 25, 2004, Holtcamp visited Glover's colleague, Angela Phelps, M.D. ("Phelps"), with complaints of back and neck pain. (Tr. 124). Holtcamp reported some improvement with Naprosyn and physical therapy but continued pain. (Tr. 124). Phelps noted no acute abnormalities in her back or midline spine tenderness nor did she observe pinpoint tenderness. (Tr. 124). Holtcamp reported pain with straight leg raising and internal and external rotation of her hip. (Tr. 124). Phelps assessed chronic back pain and decided to treat her "conservatively" by starting Vioxx, prescribing physical therapy, and referring her to the pain clinic. (Tr. 124).

Holtcamp returned to McKeon on September 30, 2004. (Tr. 121). She stated that her neck pain radiated into her arms and was associated with tingling and burning sensations down to her fingers. (Tr. 121). She complained of joint pains and swelling in her fingers and some shoulder pain. (Tr. 121). Holtcamp took nothing for the pain. (Tr. 121). She exhibited a full range of motion but had some midline and paraspinous muscle

3

tenderness. (Tr. 121). Straight leg raising was negative and her gait was normal. (Tr. 121). McKeon noted diminished grip strength bilaterally but intact sensation. (Tr. 121). McKeon assessed neck and back pain with known disc disease. (Tr. 121). Holtcamp needed to be on an anti-inflammatory because of her degenerative joint disease symptoms but she would not take them. (Tr. 121). McKeon changed Holtcamp's Paxil prescription to Cymbalta to help with her pain and prescribed Vicodin. (Tr. 118, 121). An October 4, 2004, MRI of Holtcamp's cervical spine revealed mild posterior bulging at the C5-6 level, which caused moderate central canal narrowing and posterior disc osteophyte complex changes at C3-4 and C4-5. (Tr. 119).

George Edwards, M.D. ("Edwards"), of KC Pain Centers, evaluated Holtcamp on November 16, 2004. (Tr. 143). She complained of neck, right shoulder, lower back, and right leg pain. (Tr. 143). She stated that Voltaren provided minimal relief. (Tr. 143). Edwards noted that Holtcamp was able to walk into the treatment room, did not appear in acute distress, and could stand independently on either foot. (Tr. 144). Holtcamp's lumbar spine range of motion showed forward flexion greater than 30 degrees and extension slightly past midline with some accentuation of lower back pain. (Tr. 144). The cervical spine range of motion was normal. (Tr. 144). Holtcamp exhibited normal movement of her upper extremities with good strength throughout. (Tr. 144). Edwards noted mild to moderate tenderness at L1-L2 but more specific point tenderness at L4-L5 and L5-S1. (Tr. 144). Edwards assessed axial low back pain with right-sided lumbar radiculitis and cervical myofascial pain with possible right-sided cervical radiculitis. (Tr.

4

144). Edwards administered a lumbar epidural injection and agreed to prescribe Vicodin for the short, but not the long, term. (Tr. 144). Holtcamp returned to Edwards three times in November 2004 and December 2004. (Tr. 142). The pain in her lower back improved but she indicated that she was not pain free. (Tr. 142, 141, 140). She continued to complain of neck and shoulder pain. (Tr. 142, 141, 140). Holtcamp indicated that her lower back pain worsened in December 2004 after playing with her daughter and swinging her around. (Tr. 141). Edwards provided two cervical and one lumbar epidural injections. (Tr. 142, 140, 141).

On January 19, 2005, Holtcamp complained of multiple joint aches and arthralgias to Douglas Anderson, M.D. ("Anderson"), (Tr. 111), also of St. Luke's. Holtcamp was concerned that she had rheumatoid arthritis and she reported that she was very stiff and sore. (Tr. 111). Anderson indicated that Holtcamp's rheumatoid factor was normal and she did not have a sedimentation rate. (Tr. 111). Holtcamp did not sit or stand for more than four to five minutes at a time. (Tr. 111). Holtcamp had difficulty walking from the hall to the examination room and she exhibited very limited flexibility in her back. (Tr. 111). Holtcamp continued to work eight to nine hours a week cleaning carpets and floors as a janitor. (Tr. 111). Anderson recommended a neurosurgeon but Holtcamp was extremely hesitant to do so because she was convinced that she would have to have surgery. (Tr. 111). Edwards advised Anderson that he had provided four epidural injections with moderate improvement but she continued to report neck symptoms that caused headaches. (Tr. 139). Anderson indicated that if surgery was not an option then

5

nerve branch blocks should be considered. (Tr. 139). Holtcamp returned to Anderson on February 16, 2005, and indicated that she had done much better with the Prednisone he had prescribed her and was happy about how she felt. (Tr. 216).

Paul O'Boynick, M.D. ("O'Boynick"), of Neurosurgery Associates of Kansas, evaluated Holtcamp on February 21, 2005, when she complained of pain in her spine and all four extremities. (Tr. 137). She indicated that her upper thoracic and cervical pain caused headaches and hurt her four extremities, which decreased her movement. (Tr. 137). Holtcamp indicated that she had completed three weeks of Prednisone without significant improvement. (Tr. 137). O'Boynick noted weakness in her grip but no weakness in her upper or lower extremities. (Tr. 137). She was able to heel and toe walk with some difficulty. (Tr. 137). Her reflexes were normal and her straight leg raising was negative. (Tr. 137). O'Boynick concluded that Holtcamp's MRIs, showing a small disc bulge at L4-5 and a C5-6 mild abnormality, showed no abnormality that would explain her pain syndrome. (Tr. 137).

Holtcamp was treated by Mark Box, M.D. ("Box"), a rheumatologist, in April 2005. (Tr. 182). Box evaluated Holtcamp for potential rheumatoid arthritis. (Tr. 182). Holtcamp complained of morning stiffness, joint pain, "subjective sensation of swelling in her hands and shoulders," trouble sleeping, and generalized muscle aches and pains. (Tr. 182). Box noted that Holtcamp's labs showed a negative rheumatoid factor, a normal sedimentation rate, and a normal complete blood count. (Tr. 182). The tests were repeated several times with similar results. (Tr. 182). X-rays of her hand revealed some

6

mild spurring of her finger joints and mild joint space narrowing. (Tr. 185A). Neither her x-rays nor her labs were distinctive for rheumatoid arthritis. (Tr. 182). Holtcamp admitted that Prednisone helped with her energy and joint pain. (Tr. 182). Box observed no edema in her extremities or clear synovitis but a little "puffiness" in her hands. (Tr. 182). Despite generalized tenderness in the small joints of her hands, wrists, elbows, shoulders, knees, and ankles, Holtcamp had a normal range of motion. (Tr. 182). Box assessed arthralgia with a "high index of suspicion" that it was osteoarthritis and fibromyalgia. (Tr. 183). He prescribed Flexeril and Prednisone. (Tr. 183).

Holtcamp returned to Box on June 20, 2005, and indicated that she had stopped taking her Lodine after she ran out of her prescription. (Tr. 181). She reported that Flexeril helped with her sleep pattern. (Tr. 181). Box noted that Holtcamp showed no evidence of systemic inflammation, edema in her extremities, or significant synovitis. (Tr. 181). Box opined that Holtcamp had "classic fibromyalgia tender points." (Tr. 181). He assessed fibromyalgia and osteoarthritis and prescribed Relafen, Flexeril, and Topamax. (Tr. 181). Holtcamp was to return in two to three months. (Tr. 181).

On December 6, 2005, Holtcamp fell on her left hip and caused left wrist, hip, and knee pain. (Tr. 190). The next day, her straight leg raising was negative. (Tr. 190). She was tender on her buttock and left wrist although there was no wrist swelling and Holtcamp continued to have a full range of motion. A bone scan was performed on December 12, 2005, revealing no evidence of significant uptake within the pelvis or hips (Tr. 187). The scan indicated symmetrical uptake involving the firstcarpal metacarpal

articulations bilaterally and interphalangeal articulation of the right thumb which was likely arthritic. (Tr. 187). Two days later, Holtcamp complained of pain radiating down her left side and leg to her knee. (Tr. 186). Straight leg raising was negative and she had good hip flexion and extension. (Tr. 186).

Holtcamp returned to Box on March 30, 2006. Box noted that Holtcamp was not taking any nonsteroidal anti-inflammatory and had stopped taking Flexeril when her prescription ran out. (Tr. 179). Holtcamp complained of generalized body aches and pains with some stiffness in her hands and wrists. (Tr. 179). There was no edema in her extremities. (Tr. 179). Box noted some tenderness in the small joints of her hands but no swelling or synovitis. (Tr. 179). She had a normal range of motion in all her joints. (Tr. 179). Box again concluded that Holtcamp did not have rheumatoid arthritis as she had not developed any deformities or signs that would suggest an ongoing inflammatory arthritis. (Tr. 179). Box prescribed Holtcamp Voltaren instead of Prednisone and represcribed Flexeril. (Tr. 179).

Holtcamp complained of bilateral hand pain and numbness to Lance Bear, M.D. ("Bear"), on June 9, 2006. (Tr. 200). Bear noted that Holtcamp had a full range of motion in both hands but mild discomfort in her forearms. (Tr. 200). There was no swelling or synovitis in her hands and her elbow had full motion. (Tr. 200). X-rays showed normal bony alignment of her hands, well-maintained joint space, and minimal

degenerative changes.  (Tr. 200).  Bear assessed probable mild carpal tunnel syndrome and probable mild bilateral de Quervain's syndrome.[3]  (Tr. 200).

Five days later, Holtcamp visited H. Joe Pryor, M.D. ("Pryor"), with complaints of generalized myalgia and arthralgias of the body and neck and back pain.  (Tr. 197).  Her reflexes in her arms were normal, she had no focal weakness or sensory deficit, she was able to make a full fist, and there was no evidence of synovitis in her hands or arthritic deformities.  (Tr. 197).  An electromyographic (EMG) and nerve conduction study of the upper extremities was normal.  (Tr. 199).  Pryor noted no underlying generalized neuropathic or myopathic abnormality.  (Tr. 199).  An MRI of the cervical spine revealed a focal central disc protrusion at C4-5 with encroachment upon the dural sac.  (Tr. 240).  Anderson advised Holtcamp that the MRI showed only a "small herniated disc."  (Tr. 237).

Harold Hess, M.D. ("Hess"), of Johnson County Spine, examined Holtcamp on June 22, 2006.  (Tr. 211).  Holtcamp complained of neck pain that radiated down her arms to her fingers and low back pain that radiated down her legs.  (Tr. 211).  She reported numbness in her fingers and legs.  (Tr. 211).  Holtcamp's muscle strength, tone, and bulk were normal.  (Tr. 212).  Hess noted that Holtcamp had poor grip strength possibly secondary to poor effort.  (Tr. 212).  She had increased tone in both lower extremities and her sensory was intact.  (Tr. 212).  There was no cervical paraspinal

---

[3]  De Quervain's syndrome is an inflammation or a tendinosis of the sheath or tunnel that surrounds two tendons that control movement of the thumb.

9

muscle tenderness or tightness. (Tr. 212). Hess reviewed Holtcamp's MRI and concluded that there was no significant spinal cord compression that would explain all of Holtcamp's symptoms. (Tr. 213). A week later, an MRI of the brain showed a focal area of atrophy involving the right temporal lobe which had filled with spinal fluid and the radiologist, William C. Koury, M.D., speculated that the atrophy may be related to Holtcamp's prior trauma. (Tr. 210). The next day, a cervical spine CT revealed asymmetric disc protrusion central at C5-6, just pushing the spinal cord posteriorly at that level without spinal stenosis and mild central disc bulging at C4-5. (Tr. 207). The lumbar spine CT revealed central disc protrusion at L4-5 with mild narrowing of the canal and mild ligamentous and mild central bulging. (Tr. 208). Hess reviewed Holtcamp's cervical CT scan on July 13, 2006, and indicated that there was a relatively small right-sided C5-C6 disc herniation. (Tr. 204). Hess opined that Holtcamp's bilateral leg pain resulted from the L4-L5 stenosis and disc protrusion and her right arm pain from the C5-C6 disc herniation. (Tr. 205).

Holtcamp returned to Dr. Bear on July 10, 2006, when he noted that Holtcamp's EMG was negative. (Tr. 196). Holtcamp continued to complain of diffuse numbness in her hands and pain along the radial border of both hands. (Tr. 196). Bear indicated that he would discourage any surgical intervention for her probable subclinical carpal tunnel syndrome but administered a cortisone injection. (Tr. 196). Holtcamp was to return in three to four weeks. (Tr. 196).

10

Dr. Anderson noted on July 19, 2006, that Holtcamp achieved some success on her medication regimen which consisted of Xanax for anxiety disorder when needed and Vicodin and Paxil on a daily basis. (Tr. 227). He assessed back pain, anxiety disorder, history of fibromyalgia, and herniated discs in her cervical and lumbar spine. (Tr. 227). He prescribed Lodine and indicated that no surgical intervention was planned for her herniated discs. (Tr. 227). A thoracic spine MRI the next day revealed diffuse disc bulges at T5-6, T6-7 with slight left central mass-effect at T5-6 and right central mass-effect T6-7 as well as thickening of the ligamentum flava on the left resulting in slight mass-effect on the thecal sac at T10-11. (Tr. 203).

On September 28, 2006, Holtcamp reported to Iftekhar Ahmed, M.D. ("Ahmed"), that, since a motor vehicle accident in 1979, she had neck, back, and chest wall pain and occasional paresthesias and headaches. (Tr. 267). Ahmed noted that an MRI of Holtcamp's brain was positive for old temporal lobe injuries with some atrophy. (Tr. 267). Ahmed noted minimal weakness of the extensors and abductors in her upper extremities bilaterally and that Holtcamp's gait was unremarkable. (Tr. 268).

Andrew Pavlovich, M.D. ("Pavlovich"), of ENT Associates of Greater Kansas City, met with Holtcamp on November 7, 2006. (Tr. 255). Holtcamp reported hearing loss in her left ear since her motor vehicle accident. (Tr. 255). Pavlovich noted that Holtcamp had marked cervical neck pain with disc rupture and stenosis of the cervical spine but only mild to moderate symptoms. (Tr. 255). Pavlovich assessed severe left TMJ and otalgia with a history of osteoarthritis and possible neck abnormality, marked

conductive change in left ear, and mucocele of the lower lip. (Tr. 256). Pavlovich prescribed anti-inflammatories. (Tr. 256).

Syed P. Hassan, M.D. ("Hassan"), examined Holtcamp on January 3, 2007, when she complained of generalized body ache and neck pain. (Tr. 252). She indicated that her pain increased after Christmas when she had relatives at her home and "overdid" herself. (Tr. 252). There was no edema in Holtcamp's extremities. (Tr. 252). Hassan listed her past medical history as including fibromyalgia, cervical stenosis, malabsorption syndrome, GERD, colonic polyp, anxiety panic attacks, rheumatoid arthritis, right frontal temporal lobe atrophy, chronic vertigo, left ear ache, depression, and history of motor vehicle accident. (Tr. 252-253). He advised Holtcamp to rest and continue her medications. (Tr. 253). A week later, Holtcamp returned to Hassan and complained of an earache, dizziness, and back pain. (Tr. 253). Two days later, Hassan completed a medical assessment in which he opined that Holtcamp could sit and stand for an hour at a time for a total of two hours for each. (Tr. 250). Holtcamp could not perform simple grasping, pushing/pulling, fine manipulation, or operate foot controls. (Tr. 250). She could occasionally lift four pounds and rarely lift nine pounds. (Tr. 250). Holtcamp could occasionally carry nine pounds but rarely carry 19 pounds. (Tr. 250). Holtcamp could occasionally bend, stoop, squat, and reach above her shoulder. (Tr. 251). She could rarely crawl and never climb. (Tr. 251). Hassan indicated that she had moderate restrictions in her ability to be around unprotected heights; around moving machinery; exposed to marked changes in temperature and humidity; and exposed to dust, fumes, and

gases. (Tr. 251). She had a severe restriction to driving automotive equipment. (Tr. 251). Hassan further opined that it was necessary for Holtcamp to lay down for two hours a day. (Tr. 251). The basis for Hassan's opinion was her marked tenderness and decreased range of motion of her different joints. (Tr. 251). His diagnosis included fibromyalgia, cervical stenosis, malabsorption syndrome, rheumatoid arthritis, degenerative joint disease, depression, and anxiety. (Tr. 251).

Holtcamp returned to Hassan twice in February 2007. (Tr. 280). She reported weakness, tiredness, shakiness, and neck and lower back pain, although Cymbalta helped. (Tr. 280). Holtcamp's extremities showed no edema. (Tr. 280). A February 2007 MRI of the lumbar spine revealed mild to moderate osteoarthritis degenerative spurring in the lumbar spine at L2-3, circumferential disc bulges at L2-3 and L3-4, circumferential disc bulge at L4-5, and mild disc bulge at L5-S1. (Tr. 277-278). A CT of her neck showed no pathologically enlarged lymph nodes or discrete masses in the neck but small lymph nodes measuring less than a centimeter, a small mucous retention cyst or polyp in the floor of the right maxillary sinus, and emphysematous changes in both lungs. (Tr. 284).

### B.    Administrative Hearing

Holtcamp's case was heard by Administrative Law Judge ("ALJ") William G. Horne on January 24, 2007. Holtcamp testified that she was 47 years old and had completed the 10th grade. (Tr. 297). She lived with her husband and nine-year-old daughter. (Tr. 301). Holtcamp testified that she had no income since she filed her claim but later acknowledged that she had income in 2005. (Tr. 302, 320).

Case 4:07-cv-00750-NKL    Document 13    Filed 05/28/08    Page 13 of 22

She indicated that she had been disabled since November 1, 2003, because of back problems; rheumatoid arthritis; stenosis; neck pain; herniated disc; panic attacks; IBS; acid reflux; and hip, leg, and abdominal pain. (Tr. 298, 305-306, 311, 317). Holtcamp indicated that she needed to have three separate surgeries on her back and they were scheduled for December 2006, but she postponed it because of the hearing and because her husband would have been unable to stay home with her. (Tr. 310).

The ALJ listened to Holtcamp's listed impairments and related self-described limitations. (Tr. 332-333). Her disc herniation caused right arm pain. Holtcamp stated that she could stand for three minutes and walk for five minutes before needing to stop. (Tr. 311-312). Holtcamp stated that she "walk[s] like a turtle." (Tr. 318). She could bend but should not and could not do stairs. (Tr. 312-313). Holtcamp's knees went out on her quite often and she fell twice. (Tr. 313). She could carry a 10-pound bag of sugar with two hands. (Tr. 313-314). Holtcamp alleged that x-rays showed very large gaps from arthritic damage in her hands and thumbs and therefore she had trouble using her hands. (Tr. 314). Holtcamp's medications caused no side effects. (Tr. 303). Her medication helped some as long as she did not agitate herself by working at anything for too long. (Tr. 306). Epidural injections relieved her pain for only 11 minutes. (Tr. 307). Vicodin and Tylenol PM did not provide total pain relief. (Tr. 326-327). Holtcamp indicated that she had recovered from her 1978 accident and that she no longer suffered from depression. (Tr. 319, 322). Xanax stopped her anxiety which had also improved. (Tr. 316-317).

Case 4:07-cv-00750-NKL   Document 13   Filed 05/28/08   Page 14 of 22

The ALJ also took testimony as to Holtcamp's daily activities. Holtcamp indicated that she got her daughter ready for school and then drove her the 10 to 12 miles to school. (Tr. 303-304). Her husband picked their daughter up from school. (Tr. 304). Driving caused her arms, hands, legs, and feet to go numb. (Tr. 304). She worked around the house for 15 to 20 minutes before stopping. (Tr. 304). Holtcamp did some laundry, dishes, and cooking but with her family's help. (Tr. 307-308). She watched television but could not sit through a whole program. (Tr. 309). Holtcamp cared for her three animals and read some. (Tr. 309, 325). Holtcamp watched her grandchildren until 2005. (Tr. 324). Holtcamp stopped doing all the housework three years before the administrative hearing but while she still worked as a custodian at the church between 9 and 14 hours a week. (Tr. 121, 124, 323). When Holtcamp worked as a custodian part time until 2005, she mopped floors, wiped mirrors, got on her knees to clean, and reached above her head. (Tr. 321). Holtcamp later remembered that she did not mop or reach overhead. (Tr. 323).

Finally, the ALJ took testimony from Barbara Myers ("Myers"), a vocational expert, as to a hypothetical person of Holtcamp's age with an ability to do a full range of sedentary work except with restrictions to simple repetitive, routine, stress free work with a sit/stand option at will and walking only on level smooth surfaces. (Tr. 337). The person could not perform repetitive movement of the feet or use foot controls, perform fine dexterity with either hand, or repetitively overhead lift or reach and could occasionally bend but not crawl, kneel, or squat. (Tr. 337-338). Stair climbing could not

15

be part of the job but could be required for entering a job site.  (Tr. 337-338).  The person

could not work around unprotected heights or dangerous or moving machinery.  (Tr. 338).

Based on her experience, Myers indicated that the hypothetical person could perform

work as a credit authorizer (DOT: 237.367-014) (1,000 positions regionally, 55,000

positions nationally), an order clerk (DOT: 209.567-014) (600 positions regionally,

75,000 positions nationally), and a document preparer (DOT: 249.587-014) (1,000

positions regionally, 144,000 positions nationally).   (Tr. 338-340).

## II.    Discussion

To establish that she is entitled to benefits, Holtcamp must show that she was

unable to engage in any substantial gainful activity by reason of a medically determinable

impairment which has lasted or can be expected to last for a continuous period of not less

than 12 months.  42 U.S.C. § 423(d) and § 1382c(a)(3)(A).

### A.    Holtcamp's Severe Impairments

Although the ALJ found that Holtcamp could not return to any of her past relevant

work, he nevertheless concluded that she could still perform sedentary work with the

restrictions posed to Myers, the vocational expert.  (Tr. 23-24).  In reaching his

conclusion, the ALJ discussed the limitations set forth by Dr. Hassan, but found them

"wholly unsupported by any physical, neurological examinations and diagnostic findings

of record."  (Tr. 22).  Holtcamp argues that the ALJ therefore erred because the treating

physician's opinion is normally given substantial or controlling weight.  *Hacker v.*

*Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  However, the ALJ need not give controlling

weight to a physician's RFC assessment that is inconsistent with other substantial evidence in the record. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). In this case, the substantial evidence adduced from Holtcamp's treating physicians, except Hassan, support the ALJ's conclusion. The evaluations of Bear, Box, Edwards, Glover and Hess concluded that Holtcamp had few strength or range-of-motion limitations. (Tr. 126, 127, 144, 182, 200, 212). Although Holtcamp complained that she walked like a turtle, Edwards noted normal walking and Ahmed and McKeon noted her normal gait.[4] (Tr. 121, 143, 268).

Holtcamp additionally argues that the ALJ erred because he (1) did not "fairly consider all the evidence" and (2) relied upon Holtcamp's daily activities to disprove disability. (Doc. 9, 20). Holtcamp argues that, because the ALJ referred only to "degenerative disc disease" instead of Holtcamp's herniated disc,[5] he did not fairly interpret the evidence. Moreover, the ALJ did not discuss Hess's recommendation that Holtcamp undergo surgery.

The ALJ properly considered Holtcamp's herniated disc. Contrary to Holtcamp's assertions, there is no specific agreement among practitioners as to the vocabulary used to explain certain degenerative disc diseases such as "bulging disc", "herniated disc",

---

[4] Dr. Anderson and Dr. O'Boynick did note that Holtcamp had difficulties walking. (Tr. 111, 137).

[5] Holtcamp's exact assessment is a "posterior annular tear or fissure at L4-5, broad based disk protrusion at L5-S1 displacing the proximal right S1 root which was interpreted as a herniated disk (LF 131) . . . . The difference between degeneration and a herniation is huge." (Doc. 9, 21).

17

"pinched nerve" or "degenerative disc disease."[6]  The ALJ noted that Holtcamp's

"degenerative disc disease" was a severe impairment.  (Tr. 23).  Moreover, while it is true

that Hess finally suggested that Holtcamp undergo surgery in November, 2006, the ALJ

discussed Holtcamp's surgeries with her during her hearing and specifically noted her

aversion to surgery in 2005.[7]  (Tr. 20).

    Holtcamp also alleges that the ALJ failed to consider her impairments of

fibromyalgia and osteoarthritis although he specifically discusses them in his findings and

lists them as severe impairments.  (Tr. 20, 23).  Similarly, the ALJ did not err by not

specifically considering Holtcamp's medications.  As counsel notes, medications are

important because they may support a finding of an applicant's pain.  However, in this

case, the ALJ noted Holtcamp's medications during her hearing, listed her pain as part of

a set of severe impairments, but nonetheless concluded that the evidence did not support a

finding of disability.  Indeed, Holtcamp stated that she did not suffer side-effects from her

medications.  (Tr. 303).  Holtcamp missed appointments with her physicians by months

and did not return to physical therapy - factors which support the ALJ's assessment of

Holtcamp's pain.  *See Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997).

---

[6]  *See Holmstrom v. Massanari*, 270 F.3d 715, 718 (8th Cir. 2001) ("The records from his years
in California contain X-rays, CT scans and MRIs performed between 1991 and 1995 that show
narrowed disc spaces, spur formation, degenerative disc disease and disc bulges or herniations in
the lower lumbar and upper sacral region of Holmstrom's spine."); Peter F. Ullrich, Jr., *What's a
Herniated Disc, Pinched Nerve, Bulging Disc . . .?,* Spine-Health.com, Jan. 10, 2007.

[7]  In November 2006, Dr. Anderson reviewed Holtcamp's new MRI showing a left T5-T6 bulge
and a right T6-7 disc bulge, and her cervical CT scan revealing a C5-C6 disc herniation and C5-
C6 disc protrusion.  (Tr. 265).  Holtcamp was advised of the option for an anterior cervical
discectomy and fusion at C5-C6.  (Tr. 265).

18

With respect to Holtcamp's second allegation - that the ALJ used her daily activities to disprove disability - the Court disagrees. The ALJ based his decision on the medical evidence showing no diagnosis that would explain or support Holtcamp's subjective complaints of pain; few limitations; and inconsistencies in her subjective complaints. (Tr. 20). Her daily activities, some of which were reported after her disability onset date, provided additional evidence to support the ALJ's finding. (Tr. 19). The ALJ may consider Holtcamp's daily activities or part-time work as evidence inconsistent with her complaints of pain. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004).

**B.     Holtcamp's RFC**

Holtcamp argues that the ALJ erred in posing his hypothetical questions to the vocational expert, Myers, because he asked Myers to assume "the full range of sedentary work" except it has to be simple, repetitive, routine, stress free with a sit/stand option at will, level walking, no repetitive feet use or foot controls, no crawling, kneeling, squatting, no stairs, no unprotected heights, no dangerous moving machinery, can use other hand for fine dexterity, no repetitive overhead lifting or reaching. (Tr. 337-338). According to Holtcamp, the ALJ must offer substantial evidence of Holtcamp's ability to work. *See Simonson vs. Schweiker,* 699 F.2d 426, 429 (8th Cir. 1983). Without explanation, Holtcamp accuses the ALJ of transitioning between his proposed hypothetical questions "very ambiguously" although the record shows that the ALJ set forth specific hypothetical limitations upon which Myers testified. (Tr. 336-38).

The ALJ determined that Holtcamp would need a job which allowed her to sit or stand freely, which would ordinarily preclude employment. SSR 83-12. Holtcamp also argues that the medical vocational guidelines require that if there is less than a significant range of sedentary work, individuals should be found disabled. 20 C.F.R. Part 404 Subpart P, Appendix 2 201.00 (g)(h).

The ALJ properly determined Holtcamp's RFC, after weighing the observations of treating physicians and others, and Holtcamp's description of her limitations. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Holtcamp's RFC allowed for sedentary work as defined in the regulations with further restrictions to simple, routine, and repetitive job tasks in a relatively stress-free work environment. (Tr. 22). Despite not giving full credit to Holtcamp's allegations, the restrictions were extensive. The RFC was more restrictive than Dr. Hassan's opinion in certain areas such as stooping and squatting. (Tr. 251, 22). The RFC was consistent with Dr. Hassan's opinion regarding bending, crawling, climbing, overhead reaching, performance of fine dexterity, foot control, and environmental restrictions. (Tr. 250-251, 22). The ALJ discussed Holtcamp's medical records and explained how the evidence related to her claims. (Tr. 22). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir.1995)).

Holtcamp correctly notes that Social Security Rule 83-12 reflects that "ordinarily" sit/stand option jobs at will preclude unskilled work. However, Holtcamp incorrectly

states that this is inconsistent with the ALJ's decision. In *Carlson v. Chater*, 74 F.3d 869 (8th Cir. 1996), the plaintiff argued that the ALJ ignored SSR 83-12 which stated that unskilled jobs would preclude an individual from sitting or standing at will which her pain required. *Id*. at 871. However, a complete reading of 83-12 reveals that "in cases of unusual limitation of ability to sit or stand a [vocational expert] should be consulted to clarify the implications for the occupational base." *Id*. quoting SSR 83-12. The vocational expert in that case specifically took into account the plaintiff's need to alternate positions when assessing which jobs she could perform, and thus, his testimony supported the ALJ's decision that Holtcamp could perform unskilled jobs. *See Carlson*, 74 F.3d at 871; *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001). Here, the ALJ also requested the testimony of a vocational expert to clarify the implications for the occupational base. (Tr. 337-340).

Holtcamp also incorrectly cites to 20 C.F.R. Part 404 Subpart P, Appendix 2 201.00(g). As Holtcamp was only 47 at the time of the decision, the regulations regarding an individual approaching advanced age does not apply. (Tr. 297). 20 C.F.R. Part 404 Subpart P, Appendix 201.00 (h), does apply but does not "reflect that if there is less than a significant range of sedentary work individuals should be found disabled." (Doc. 9, 28). A finding of disabled "may" be appropriate but the inability to perform a full range of sedentary work does not necessitate a finding of disabled. 20 C.F.R. Part 404 Subpart P, Appendix 201.00 (h)(3). The determination requires the consideration of individualized factors. *Id*. Therefore, the ALJ properly relied upon Myers's testimony in

assessing individualized factors.  *See Nelson v. Sullivan*, 946 F.2d 1314, 1317 (8th Cir. 1991).

Myers testified that, based on the credible functional limitations, a hypothetical person could perform work as a credit authorizer (55,000 positions nationally), an order clerk (75,000 positions nationally), or a document preparer (144,000 positions nationally). (Tr. 338-339).  Myers explained that, based on her experience, the positions allowed for a sit/stand option at will.  (Tr. 340).  The second hypothetical question explicitly adopted the limitations set forth in the first hypothetical question to determine whether the same hypothetical person could perform "other work" since they could not perform Holtcamp's past relevant work.  The ALJ properly relied on Myers's testimony regarding the availability of other work and found that there was a significant number of jobs that Holtcamp could perform.  (Tr. 22).

## III.   Conclusion

Accordingly, it is hereby

ORDERED that Holtcamp's Motion for Summary Judgment [Doc. # 9] is DENIED.

> s/ Nanette K. Laughrey _____
> NANETTE K. LAUGHREY
> United States District Judge

Dated:  May 28, 2008
Kansas City, Missouri